

June 10, 2019

**Via CM/ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>United States v. Mark Nordlicht, et al.</u>, No. 1:16-cr-00640-BMC

Dear Judge Cogan:

At the conclusion of the oral argument for a judgment of acquittal last Friday we invited the government lawyers to join in our application to dismiss all counts against our client, and having reviewed the government's letter it appears they implicitly have. (Dkt. 741) The letter filed early this morning all but acknowledges that there is no evidence in the record that could permit a reasonable juror to find sufficient evidence to support a guilty verdict as to Mr. SanFilippo under any count.  As such, Rule 29 counsels in favor of entering a judgment of acquittal now.

As this Court is well aware, after seven weeks of trial, no witness testified to a single meeting, conversation, email exchange or other communication with Mr. SanFilippo that might show he knew of a criminal conspiracy or scheme to defraud, joined in it, or made efforts toward its success.  The government's letter does not even attempt to dispute the complete and total lack of evidence against him. Rather, it simply argues that Mr. SanFilippo should be convicted because "Defendants" mislead investors and "omitted material information" without bothering to specify what exactly Mr. SanFilippo said or omitted to who and when (as the Court recommended to the government would be "helpful"). The government simply failed to meet its burden here.  Indeed, as this Court wrangles with larger questions central to whether this case can survive the Rule 29 motions as to any defendant (*it should not*), it cannot be lost on Your Honor that whichever way the Court decides those questions about how Mr. Nordlicht was entitled to run Platinum, given the governing documents, and the business judgment rule, no rational trier of fact could find Mr. SanFilippo guilty of anything. This Court is empowered to prevent the miscarriage of justice that any conviction of Mr. SanFilippo would so clearly be.

***The government's letter provides no factual support as to Mr. SanFilippo for its opposition to his Rule 29 motion***

The government points to a single email in its Rule 29 opposition letter involving Mr. SanFilippo: "Mann replied that the fund's CFO [the defendant Joseph SanFilippo] had reported that Black Elk's common equity had a "carrying value of 150 million." (Ltr. at 9). But surely the government is not suggesting this proves (or even allows an inference) that Mr. SanFilippo set the black elk valuation or believed it to be fraudulently overvalued. There is no evidence that Mr. SanFilippo valued Black Elk equity or any other asset. The valuation process at PPVA involved numerous inside and outside experts, including the head of valuation, Eli Rakower, and the independent expert valuation companies. Mr. SanFilippo may have "reported" what others determined to be an asset's fair value, but no evidence allows an inference that he had reason to believe what he "reported" was false.

Given Mr. SanFilippo's defense that all material information was disclosed to investors in its annual *unqualified* audited financials, the government argues in footnote 6 of its letter that audited financial statements were not issued for 2015 and 2016. While the government does not say so, the obvious implication is the government wishes to use this fact to argue that the valuations for 2015 and 2016 were inaccurate or overvalued. The government knows better. Indeed, every material PPVA asset was reviewed by Sterling and/or A&M (both companies for Q2 2015), and every single PPVA asset was found to be valued within the range of reasonableness from 2012 - June 2016. (1-DX-5201-5225). The government knows that these valuation reports were sent to PPVA (and PPCO) quarterly, without interruption and the last ones were sent to Mr. SanFilippo on June 8 and 9, 2016. (DX-5224, 5225). The government spoke with over a dozen individuals from Sterling, A&M, CohnReznick, CohnReznick's third party valuation expert, VRC, and not a single witness indicated any concern over the valuation of any asset – up to and including the finalized reports sent in June 2016. Of course, this why the government declined to call anyone from these companies or notice any expert.

While the government does not address Mr. SanFilippo's email to BDO regarding the PPNE notes in its letter, since it formed the sole basis for the government's opposition at oral argument on Friday, it is worth putting this issue to bed here.

The government asserted on Friday that it believes it is entitled to argue to the jury and allow the jury to draw the inference that Mr. SanFilippo lied to the auditors about the state of the fund's liquidity based on a single e-mail. Despite the mountain of evidence that BDO knew everything about PPVA's financials, including that the auditors had access to all of its bank and brokerage statements, the government actually stated in open court that when Mr. SanFilippo e-mailed that "the purpose of the PPNE loans was for liquidity to complete a specific transaction and the July 1st loan was for general liquidity purposes," (GX-963) that he was lying to the auditors about the fund's liquidity as of this date.

Notably, the government failed to call to the stand the recipient of this email, or any auditor from either BDO or CohnReznick to inquire into whether they were actually ever mislead by Mr. SanFilippo as to the fund's liquidity. Rather, the government elicited the introduction of this email through special agent Julie Amato. There is no evidence in the record that Mr. SanFilippo intended to mislead anyone by sending this email. The government's argument that this description of the purpose of these loans was to mislead the auditors (and by extension PPVA investors) does not merit jury consideration. As an initial matter, the email itself discloses that the purpose behind both loans was for "liquidity," so the argument that Mr. SanFilippo was attempting to hide the fund's liquidity issues is contradicted by the face of the document. More to the point, the "PPNE loans" were "for liquidity to complete a specific transaction," specifically the Northstar purchase and continued investment in that company. The record establishes that approximately $40 million in cash went towards Northstar in 2014, and the wire transfers entered into evidence prove that more than $10 million went from PPVA to Northstar the following year.

### *The asset valuations were reasonable and Mr. SanFilippo had no reason to doubt them, nor did he*

The government argues in its letter that "the evidence adduced at trial clearly shows that the defendants knew that by late 2013, PPVA's portfolio was dominated by underperforming, cash flow-negative oil-and-gas investments." (Ltr. pg. 8). While this is not true, even if it were, the government has not shown that Mr. SanFilippo knew or should have somehow known that these assets were overvalued because of these facts. Quite the opposite, that Golden Gate, Black Elk, and Northstar were not profitable and had vendor payables was well known to the auditors and the valuation experts (and the head of valuation, Eli Rakower). As the audited financials and valuation reports make plain, these facts were explicitly taken into account when the experts and auditors were determining the fair value for these level 3 assets.

The government misrepresents to this Court that "defendants" (without evidence to include Mr. SanFilippo) "lied about the companies' performance to PPVA investors and prospective investments." (*Id*.) There is no evidentiary support for this assertion. The contrary was shown at trial. Indeed, the most material facts – as determined by the auditors – were included in the 2013 audited financial statement (published in February 2015 including subsequent events up to that date), whose discussion of the Black Elk valuation asset began with the disclosure: "For the years ended December 31, 2013 and 2012 BEEOO has been unprofitable and has been subject to litigation. As of September 30, 2104, BEEOO had a net working capital deficit of approximately $62 million and a member's deficit of approximately $100.5 million. The net working capital deficit at September 30, 2014 is primarily the result of BEEOO's accounts payable and accrued expenses of $96.3 million. Additionally, BEEOO has outstanding 13.75% Senior Secure Notes (the "Notes). Net of approximately $400,000 debt discount, of approximately $138.2 million which will mature in December 2015."  (DX-2006, pg 38).

More specifically, the audited financials disclosed:

> For the years ended December 31, 2013 and 2012 BEEOO has been unprofitable and has been subject to litigation. As of September 30, 2014, BEEOO had a net working capital deficit of approximately $62 million and a members' deficit of approximately $100.5 million. The net working capital deficit at September 30, 2014 is primarily the result of BEEOO's accounts payable and accrued expenses of $96.3 million. Additionally, BEEOO has outstanding 13.75% Senior Secured Notes (the "Notes"), net of approximately $400,000 debt discount, of approximately $138.2 million which will mature in December 2015.
>
> During 2014, in order to effect change to make BEEOO profitable, changes were made to its management team and operations. BEEOO's new management team has extensive engineering, geological, geophysical, technical and operational expertise in successfully developing and operating properties.
>
> In March and August 2014, BEEOO entered into sale transactions to sell its interests in fields in the Gulf of Mexico, which represents a significant amount of BEEOO's current cash flow, proved and producing reserves and production. The combined net proceeds of the two transactions were approximately $175.1 million and BEEOO utilized the proceeds from the sale to repurchase $11.4 million of its outstanding $150 million public bonds that were subject to a call option by BEEOO and to re-purchase Series E preferred units of approximately $96 million. The Master Fund, which holds a portion of the Notes and is the primarily holder of the Series E preferred Units, received approximately $40.1 million during 2014 from BEEOO for the retirement of approximately 40.1 million Series E preferred units.
>
> As of December 31, 2013, BEEOO held an aggregate net interest in approximately 457,065 gross (223,852 net) acres under lease and had an interest in 113 gross wells, 93 of which are producing.
>
> As of September 30, 2014, BEEOO held an aggregate net interest in approximately 273,916 gross (146,403 net) acres under lease and had an interest in 547 gross wells, 68 of which are producing. Through December 31, 2014 the Master Fund has significantly marked down its equity investment in BEEOO based on the aforementioned sales of assets and the commodity decline in oil and gas prices.

Golden Gate was described as "Development Stage Entity" which is defined as a company that is not yet producing any significant revenues from oil extraction. The financials also fully disclosed that Platinum had already invested over $37 million in the company without meeting any production milestones, and further disclosed that the company had failed to make interest payments on some of its loans. (*Id.*)

The financials specifically disclosed:

> **Golden Gate Oil, LLC**
>
> Golden Gate Oil, LLC ("Golden Gate"), is a California mid-coast onshore oil & gas exploration & production company with assets and oil reserves in the Santa Maria, California area. In addition to the existing horizontal monterey shale drilling program that is in progress, Golden Gate plans to grow its onshore portfolio through acquisitions and organic prospect generation in the lower 48 states as future cash flow dictates. Golden Gate is considered a "Development Stage Entities" in accordance with ASC Topic 915-10. As of December 31, 2013, the Master Fund has investments in Golden Gate consisting of limited liability company interest and note receivables
>
> 40

> totaling $191,577,277 resulting in a 48% ownership in Golden Gate with an option agreement for increasing to 100% ownership.
>
> On an as if converted basis of equity ownership to 100%, the Master Fund used a market approach, specifically a guideline public company method, to estimate the enterprise value of Golden Gate. The Master Fund applied a multiple of 0.88x to the net present value of Golden Gate's reserves, which are currently primarily non-producing. The multiple was based on the low quartile of comparable public companies with multiples ranging from 2.1x to 0.6x. A discount range of 50% to 60% was then applied to the multiple to arrive at the enterprise value of Golden Gate which is classified in Level 3 of the fair value hierarchy.
>
> On February 26, 2014, Beechwood Asset Management ("BAM"), a related party of the General Partner, purchased approximately $28 million of Golden Gate senior secured debt owned by Precious Capital, a majority-owned subsidiary of the Master Fund. The purchased amount included principal and interest. Precious Capital retained approximately $3.2 million of its debt and was appointed as BAM's "Agent" over the total debt facility to GGO. The Master fund sold and assigned the right, title and interest to an aggregate $21,805,500 of principal amount the Note and $6,584,830 of interest, including deferred interest, due from Golden Gate.
>
> On March 26, 2014, Golden Gate and Precious Capital amended the loan documents to waive any payment defaults through December 2014 and to extend the original $25 million credit limit by an additional $5 million.
>
> On June 2, 2014, Santa Barbara County's Air Pollution Control District issued to Golden Gate environmental permits allowing Golden Gate's Casmalia leasehold to produce wells using steam into the production facility. Approximately one week later, the county granted Golden Gate an exemption for running seismic survey lines across farmland leases. This exemption will allow for Golden Gate to run a proper 3-D seismic geological survey which will be pertinent to any next round of drilling.
>
> As a result of certain production milestones not being met in accordance with the First Amendment to the Amended and Restated Operating Agreement of Golden Gate Oil, LLC, on August 14, 2014 and September 2, 2014, Precious Capital negotiated a buyout agreement with third parties resulting in Precious Capital owning 100% of Golden Gate. The initial upfront payment was approximately $3.2 million with an additional contingent payment of approximately $5.9 million due upon Golden Gate production reaching at least 45,000 barrels per month for three consecutive months.
>
> In October 2014, Precious Capital and Golden Gate amended the loan documents to extend its credit limit from $30 million to $37 million and also extended the maturity date to October 1, 2015.
>
> Through December 31, 2014, the Master Fund has marked down its equity investment in Golden Gate based on the commodity decline in oil and gas prices.

Finally, the government repeats in its letter the unsupported allegation that PPVA mislead investors about the liquidity of fund assets because Amir Shaked testified that after reviewing a

table in PPVA's 2014[1] audited financial statements he saw that the discount rates for the Level 3 assets "were high" and therefore according to Shaked "it appeared the discount rates were sufficiently high, such that if Platinum wanted to sell any of these assets, they should be able to do it with no issue." (Ltr. pg. 10, citing Shaked, Direct 2028). The government's argument appears to be, that because Platinum applied a high "lack of marketability" discount to its level three investments, they were actually very liquid. But this testimony disclosing an esoteric and unreasonable belief of Mr. Shaked, which is contrary to market standards as to what the audited financials actually disclose, cannot be used to prove that Mr. SanFilippo intentionally misled Shaked or any other investor as to the fund's level 3 assets or its level of liquidity. Obviously, the purpose of the chart was to disclose that the assets were illiquid level 3 assets, as amply described in the audited financials.

Shaked either misunderstood these charts, or intentionally lied, but whichever it is, neither provides the jury with any evidence that the chart was published with an intent to mislead investors. The chart at issue clearly disclosed that the discount for marketability was applied prior to settling on the "fair value" not after. There is no way that Mr. SanFilippo or anyone else at any of the auditing firms could have realized that Mr. Shaked's understanding would be so erroneous. The charts and discounts for "lack of marketability" remained essentially the same during 2012, 2013, and 2014. And critically, Mr. Shaked testified that after reviewing the 2014 financials he understood that the chart faithfully disclosed the fund's significant illiquidity to the high level of level 3 assets. He then, however, testified erroneously that the chart was different in 2014. This is demonstrably false.

Shaked testified, as to the 2014 audited financial statement (1-DX-5107, page 40):

---

[1] In its letter, the government erroneously asserts that Mr. Shaked was discussing a chart from 2012 financial but, as his testimony cited herein makes clear, he was referring to a chart from the 2014 audited financials.

```
 3   Q    What is described in this table, Mr. Shaked?
 4   A    This table describes information I was trying to
 5   reference, which shows the breakdown first of categories of
 6   assets, Level Three assets; and the very, very important
 7   discount rates that are applied to these valuations.
 8   Q    What, if anything, was it about the 2014 report that you
 9   believed was different from previous reports?
10   A    Well, first, this report also has additional tables that
11   give an even further breakdown of these assets.  And that
12   breakdown in conjunction with this table showed different
13   statistics as to which assets were included and which assets
14   also were observable and liquid.
```

This testimony that the 2014 chart was different than the prior years is demonstrably false as every chart from 2012 to 2014 was identical and disclosed that the fund's level 3 assets were illiquid – as level 3 assets are so defined.

For 2014 (1-DX-5107) the chart looked like this:

## Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries

### Notes to Consolidated Financial Statements
### (Stated in U.S. Dollars)

*Master Fund Controlling Interests*

At December 31, 2014, the Master Fund had a controlling interest in various investments valued at $506,915,858 consisting of $410,935,171 of equity securities, net, and $95,980,687 of debt securities.

*Level 3 Valuation Processes*

The General Partner establishes valuation processes and procedures to ensure that the valuation techniques for investments that are categorized within Level 3 of the fair value hierarchy are fair, consistent and verifiable. The General Partner designates a Valuation Committee (the "Committee") to oversee the valuation process of the Master Fund's Level 3 investments. The Committee is comprised of Senior Investment Manager personnel and presided over by the Chief Investment Officer ("CIO") and President of the General Partner. The Committee is responsible for reviewing the Master Fund's written valuation processes and procedures, conducting periodic reviews of the valuation policies, and evaluating the fairness and consistent application of the valuation policies as established by the General Partner.

Additionally, as part of the review process, the Master Fund has engaged a third-party independent valuation specialist to review and report on all material Level 2 and Level 3 investment valuations on a quarterly basis.

**Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Stated in U.S. Dollars)**

*Level 3 Valuation Techniques*

The following table summarizes the valuation techniques and significant unobservable inputs used for the Master Fund's investments that are categorized within Level 3 of the fair value hierarchy as of December 31, 2014:

| | Fair Value at December 31, 2014 | Valuation Techniques | Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| **Investments in securities:** | | | | |
| Limited liability company interests | $293,622,339 | Market approach | Valuation multiples (present value of reserves) | .76 |
| | | Market approach | Discount for lack of marketability | 30% |
| | | Market approach | Discount on valuation multiples | 15% to 39% (20%) |
| | | Market approach | Valuation multiples (enterprise value/EBITDA) | 6.1 to 7.2 (6.5) |
| | | Income approach | Net present value discount | 10% |
| | | Income approach | Terminal growth rate | 3% |
| Common stock | 117,636,395 | Market approach | Discount for lack of marketability | 0% to 51% (18%) |
| | | Market approach | Comparable transaction | n/a |
| | | Market approach | Valuation multiples (enterprise value/ounce of gold) | 37.6 |
| | | Market approach | Discounts on valuation multiples | 40% |
| Convertible preferred stock | 90,055,191 | Market approach | Comparable transaction | n/a |
| | | Income approach | Net present value discount | 18% |
| Notes receivable | 97,098,418 | | | |
| | | Income approach | Market yield | 0% to 15% (9.73%) |
| | | Income approach | Discount rate | 0% to 12.7% (10.84%) |
| | | Income approach | Months to maturity | .5 to 106.73 (24.86) |
| | | Liquidation approach | Replacement cost | n/a |
| Convertible notes | 90,795,592 | Market approach | Discount for lack of marketability | 51% |
| | | Income approach | Net present value discount | 18% |
| | | Income approach | Discount on valuation multiples | 15% |
| | | Income approach | Terminal growth rate | 3% |
| | | Income approach | Valuation multiple (enterprise value/EBITDA) | 7.2 |
| Securities purchased under agreements to resell | 40,511,371 | Income approach | Net present value discount | 19% to 20% (19.23%) |
| Certified emission credits | 34,565,009 | Income approach | Net present value discount | 10% |
| Investment companies | 23,638,452 | NAV at fair value | n/a | n/a |
| | | Market approach | Comparable transaction | n/a |
| Preferred stock | 8,535,832 | Income approach | Net present value discount | 10% |
| | | Income approach | Probability of payout | 70% |
| | | Market approach | Valuation multiples (present value of reserves) | 0.87 |
| Convertible bonds | 485,058 | Income Approach | Discount rate | 9.89% |
| **Unrealized appreciation on derivative contracts:** | | | | |
| Equity swaps | 3,909,816 | Market approach | Transaction price | n/a |
| **Total** | **$800,853,473** | | | |

But contrary to Shaked's testimony, there is no material difference between the above chart and the chart in the 2013 financials (DX-2006), which provided the identical type of information to disclose how the fund arrived at the estimated fair value of its level 3 assets:

*Level 3 Valuation Processes*

The General Partner establishes valuation processes and procedures to ensure that the valuation techniques for investments that are categorized within Level 3 of the fair value hierarchy are fair, consistent and verifiable. The General Partner designates a Valuation Committee (the "Committee") to oversee the valuation process of the Master Fund's Level 3 investments. The Committee is comprised of Senior Investment Manager personnel and presided over by the Chief Investment Officer ("CIO") and President of the General Partner. The Committee is responsible for reviewing the Master Fund's written valuation processes and procedures, conducting periodic reviews of the valuation policies, and evaluating the fairness and consistent application of the valuation policies as established by the General Partner.

The Committee meets on a quarterly basis or as needed to review the valuation of the Master Fund's Level 3 investments. Valuations determined by the CIO, and presented to the Committee are required to be supported by market data, third-party pricing sources; industry accepted pricing models, counterparty prices, or other methods the Committee deems to be appropriate, including the use of proprietary pricing models.

Additionally, as part of the review process the Master Fund has engaged a third-party independent valuation specialist to review and report on all material Level 2 and Level 3 investment valuations on a quarterly basis.

*Level 3 Valuation Techniques*

The following table summarizes the valuation techniques and significant unobservable inputs used for the Master Fund's investments that are categorized within Level 3 of the fair value hierarchy as of December 31, 2013:

| | Fair Value at December 31, 2013 | Valuation Techniques | Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| Investments in securities: | | | | |
| Limited liability company interests | $355,800,304 | Market approach | Valuation multiples (present value of reserves) | .88 to .95 (.91) |
| | | Market approach | Discount for lack of marketability | 8% to 60% (35.94%) |
| | | Cost approach | Replacement cost | |
| | | Net asset value at fair value | n/a | |
| Notes receivable | $85,021,248 | Income approach | Net present value discount | 30% |
| | | Income approach | Market yield | 0% to 24% (13.25%) |
| | | Income approach | Discount rate | 6% to 60% (35.94%) |
| | | Cost approach | Replacement cost | n/a |
| | | Cost approach | Discount for lack marketability | 15% |
| Common stock | $75,824,050 | Market approach | Discount for lack of marketability | 15% to 48% (42.39%) |
| | | | Comparable transaction | n/a |
| | | | Valuation multiples (gross profit) | 3.74 to 3.08 (3.41) |
| | | | Discounts on valuation multiples | 18% to 28% (23%) |
| | | | Valuation multiples (market value per ounce) | 59.26 |

### Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries

#### Notes to Consolidated Financial Statements
#### (Stated in U.S. Dollars)

| | Fair Value at December 31, 2013 | Valuation Techniques | Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| Preferred stock | $16,017,470 | Income approach | Net present value discount | 10% |
| | | Market approach | Valuation multiples (present value of reserves) | 0.95 |
| | | Market approach | Discount for lack of marketability | 15% to 25% (20%) |
| Securities purchased under agreements to resell | $12,357,810 | Income approach | Net present value discount | 15% to 20% (18.77%) |
| Convertible notes | $53,384,339 | Market approach | Discount for lack of marketability | 15% to 25% (20.23%) |
| | | Income approach | Net present value discount | 22% to 27% (24.5%) |
| | | | Terminal growth rate | 3% |
| | | | Yield | 10% to 65% (32.44%) |
| | | | Investment term | 180 days |
| | | | Days to maturity | 65 to 105 days (81.32) |
| Certified emission credits | $31,807,248 | Income approach | Net present value discount | 10% |
| Convertible preferred stock | $39,030,178 | Market approach | Discount for lack of marketability | 15% to 90% (18.41%) |
| | | | Comparable transaction | n/a |
| | | Income approach | Net present value discount | 22% to 27% (24.89%) |
| | | | Terminal growth rate | 3% |
| Investment companies | $12,245,243 | Net asset value at fair value | n/a | n/a |
| Convertible bonds | $612,495 | Income Approach | Net present value discount | 9.89% |
| Total | $682,100,385 | | | |

The Master Fund invests in a various investments as part of its investment objective and identified additional disclosures related to Level 3 investments and inputs utilized to value such investments are as follows:

Similarly, there is no material difference between the above two charts and the chart provided in the 2012 financials (DX-1232), which provided the identical type of information to disclose how the fund arrived at the estimated fair value of its level 3 assets:

## Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries

### Notes to Consolidated Financial Statements
(Stated in U.S. Dollars)

*Level 3 Valuation Processes*

The General Partner establishes valuation processes and procedures to ensure that the valuation techniques for investments that are categorized within Level 3 of the fair value hierarchy are fair, consistent and verifiable. The General Partner designates a Valuation Committee (the "Committee") to oversee the valuation process of the Master Fund's Level 3 investments. The Committee is comprised of Senior Investment Manager personnel and presided over by the Chief Investment Officer ("CIO") and President of the General Partner. The Committee is responsible for reviewing the Master Fund's written valuation processes and procedures, conducting periodic reviews of the valuation policies, and evaluating the fairness and consistent application of the valuation policies as established by the General Partner.

The Committee meets on a monthly basis or as needed to review the valuation of the Master Fund's Level 3 investments. Valuations determined by the CIO, and presented to the Committee are required to be supported by market data, third party pricing sources, industry accepted pricing models, counterparty prices, or other methods the Committee deems to be appropriate, including the use of proprietary pricing models.

Additionally, as part of the review process the Master Fund has engaged a third party independent valuation specialist to review and report on all material Level 2 and Level 3 investment valuations on a quarterly basis.

*Level 3 Valuation Techniques*

The following table summarizes the valuation techniques and significant unobservable inputs used for the Master Fund's investments that are categorized within Level 3 of the fair value hierarchy as of December 31, 2012:

|  | Fair Value at December 31, 2012 | Valuation Techniques | Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| Investments in securities: |  |  |  |  |
| Limited liability company interests | $274,244,486 | Market approach | Valuation multiples (present value of reserves) | .5 |
|  |  | Market approach | Valuation multiples (gross profit) | 3.533 to 3 (3.45) |
|  |  | Market approach | Valuation multiples (ebitda) | 11.3 |
|  |  | Market approach | Discount for lack of marketability | 30% |
|  |  | Market approach | Comparable transaction | n/a |
|  |  | Income/market approach | Net present value discount | 25% |

| | | | | |
|---|---|---|---|---|
| Notes receivable | 86,655,859 | Discounted cash flow model | Net present value discount | 8% to 96.5% |
| Common stock | 78,807,365 | Market approach | Discount for lack of marketability | 20% to 78% |
| | | | Comparable transaction | n/a |
| | | | Valuation multiples (gross profit) | 3.533 to 3 (3.45) |
| | | | Valuation multiples (market value per ounce) | 50.85 |
| Preferred stock | 42,908,042 | Discounted cash flow model | Net present value discount | 10% to 24% |
| Securities purchased under agreements to resell | 38,239,646 | Discounted cash flow model | Net present value discount | 15% |
| Convertible notes receivable | 26,267,505 | Market approach | Discount for lack of marketability | 30% to 77.5% |

35

## Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries

### Notes to Consolidated Financial Statements
(Stated in U.S. Dollars)

| | Fair Value at December 31, 2012 | Valuation Techniques | Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| Investments in securities: | | | | |
| Certified emission credits | $ 19,578,304 | Discounted cash flow model | Net present value discount | 10% |
| Convertible preferred stock | 17,092,053 | Market approach | Discount for lack of marketability | 20% to 90% |
| | | | Comparable transaction | n/a |
| Investment companies | 13,874,229 | Net asset value at fair value | n/a | n/a |
| Warrants | 7,735,035 | Industry accepted model | Valuation multiples (gross profit) | 3.533 to 3 (3.45) |
| Portfolio receivables | 2,741,197 | Discounted cash flow model | Historical collection rates | .46% to .92% |
| | | | Net present value discount | 45% |
| Convertible bonds | 1,310,137 | Discounted cash flow model | Net present value discount | 9.89% to 15% |
| | | | Recovery ratio | 17.10% |
| Call option | 1,187,500 | Industry accepted model | Discount for lack of marketability | 78% |
| Total | $610,641,358 | | | |

Hon. Brian M. Cogan, U.S.D.J. - 15 - June 10, 2019

    Plainly, that Mr. Shaked may have misunderstood that the audited financial statements were disclosing the funds high percentage of illiquid level 3 assets for something else does not permit the jury to draw an inference that Mr. SanFilippo intended to deceive him as part of a securities fraud.

    This Court should grant Mr. SanFilippo's Rule 29 motion in favor of a judgment of acquittal.

Respectfully submitted,

_____

Kevin J. O'Brien
Adam C. Ford
Matthew A. Ford
Anjula Prasad
FORD O'BRIEN LLP
575 Fifth Avenue 17th Fl.
New York, New York 10017